IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 2, 2019

## STATE OF TENNESSEE v. ANTONIOUS JOHNSON and RODNEY WILLIAMS

**Appeal from the Criminal Court for Shelby County**
**No. 15-02112      W. Mark Ward, Judge**

_____

### No. W2018-01125-CCA-R3-CD

_____

The Defendants, Antonious Johnson and Rodney Williams, were convicted by a Shelby County Criminal Court jury of first degree felony murder, aggravated burglary, and employment of a firearm during the commission of a dangerous felony, and Defendant Johnson was additionally convicted of aggravated robbery and theft of property valued at more than $1000. Defendant Johnson received a sentence of life imprisonment plus nine years, while Defendant Williams received a life sentence. On appeal, the Defendants argue that the trial court improperly admitted the victim's testimony and that the evidence is insufficient to sustain their convictions. Additionally, Defendant Johnson argues that he is entitled to relief based on cumulative error, while Defendant Williams argues that the trial court committed plain error in admitting a photograph of him at the crime scene and that his life sentence is cruel and unusual because he was a juvenile at the time of the offense. After thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

C. Anne Tipton, Memphis, Tennessee, for the appellant, Antonious Johnson.

Claiborne H. Ferguson (on appeal), and Charles S. Mitchell (at trial), Memphis, Tennessee, for the appellant, Rodney Williams.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Greg Gilbert and Omar Malik, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

In March 2015, a Shelby County grand jury indicted the Defendants for the first degree felony murder of Marcus Turner, aggravated burglary, theft of property valued at more than $1000, aggravated robbery, and employment of a firearm during the commission of a dangerous felony. Following a jury trial, the Defendants were convicted of first degree felony murder, aggravated burglary, and employment of a firearm during the commission of a dangerous felony, and Defendant Johnson was additionally convicted of aggravated robbery and theft of property valued at more than $1000. We now review the facts relevant to this appeal.

At trial, Ms. Shaquita Veasley testified that on the night of December 17, 2014, she and her boyfriend, the victim, returned to their shared residence after visiting with the victim's grandmother. After she parked her car in the driveway, Ms. Veasley entered the residence. She then saw two men emerge from the living room, one of whom "had a gun in [her] face" and "told [her] don't say nothing, where the money at[?]" Ms. Veasley testified that the "barrel on [the gun] was long[,]" and the two men had "[d]ark skin" and wore "all black[;] all black hoody, dark jeans." Ms. Veasley replied to the man with the gun that she did not have any money, and he then asked her to "take him to [the money]." The victim then entered the residence and after seeing the man pointing a gun in Ms. Veasley's face, "grabbed the gun and was trying to take it" from the man. As he was trying to disarm the intruder, the victim instructed Ms. Veasley to "go get some help." Ms. Veasley realized her cell phone battery was almost depleted and ran to a neighbor's house for help. When the neighbor refused to let her use his phone, Ms. Veasley managed to call 911 from her own cell phone and headed back toward her residence. As she approached her residence, Ms. Veasley saw the man with the gun emerge from the residence, and he again pointed his gun at her.

Ms. Veasley testified that she recognized the two men who were in her house on December 17, 2014. She recognized the man with the gun as Defendant Johnson, whom she referred to as "Little T," and the other man as Defendant Williams, whom she referred to as "Ro Ro." She recognized Defendant Williams because he was her neighbor, and she had seen Defendant Johnson "around the neighborhood" with Defendant Williams, who was 16 years old at the time of the offense. She testified that she did not see Defendant Williams again after he emerged from her living room when she entered her home; however, she later saw Defendant Johnson emerge from her residence, still pointing a gun at her while spoke to the 911 operator. Ms. Veasley stated that at that time, she believed the victim had been shot because she saw him "just laid out on the floor. He wasn't moving, wasn't responding." While pointing his gun at Ms.

Veasley, Defendant Johnson asked if she had called the police. She responded that she had not, and Defendant Johnson took her phone from her hands. Defendant Johnson then tried to force Ms. Veasley into her vehicle, a white Lexus, so she could "take him where the money was[,]" though she continued to tell him that she did not have any money. Police arrived during this time, and Defendant Johnson then got into Ms. Veasley's car and drove away after finding her keys inside the car.

Ms. Veasley "ran up to [the police officer]" when he arrived and explained what happened and that she believed the victim had been shot. The officer then entered the residence. Ms. Veasley was crying and screaming, and officers placed her in the back of a squad car to calm her down. She was then taken by the officers to the homicide bureau at a police station. After speaking with investigators, she went to her mother's house and returned to the station the next day to give a formal statement in which she identified Defendant Williams as the man with the gun. She gave a second formal statement on January 4, 2015, in which she identified Defendant Johnson as the man with the gun  At trial, Ms. Veasley identified a series of photographs from the crime scene, which depicted multiple items, like her computer, that were not in the same place she had left them earlier in the day. She also identified a photograph of a .38-caliber revolver on the kitchen floor that did not belong to her or the victim. A window that was previously boarded shut also appeared to have been forced open. Ms. Veasley verified that she named the Defendants as the two intruders in a formal statement to police and identified the Defendants in separate photographic arrays.

On cross-examination, Ms. Veasley affirmed that she named Defendant Johnson as the man with the gun in her second formal statement and conceded that she previously named Defendant Williams as the man with the gun because she was scared and had "never been through nothing like this before." Ms. Veasley also conceded that she did not name the Defendants as the two intruders during the 911 call or when police first arrived at the crime scene on December 17, 2014. On redirect examination, Ms. Veasley stated that she originally named Defendant Williams as the man with the gun because the Defendants had previously broken into her house, and she was afraid of Defendant Johnson and believed he would "come back and kill [her]" if she told police about his involvement. On recross-examination, Ms. Veasley conceded that she did not actually have personal knowledge that the Defendants had previously broken into her house, though she told police that she saw them inside her house on a previous occasion.

Melissa Wright, the victim's sister, testified at trial that she went to her brother's house on December 17, 2014, after being informed that "something had happened" to the victim. She verified that she had seen Defendant Williams in her brother's neighborhood "[a] number of times" because he was her brother and Ms. Veasley's neighbor. While Ms. Wright and other family members were speaking with police at the crime scene on

- 3 -

December 17, Ms. Wright saw Defendant Williams "wearing dark clothing" and "coming . . . inside of the crime scene tape" at approximately 12 a.m. On cross-examination, Ms. Wright stated that Ms. Veasley had lived with the victim for "about a year and a half . . . maybe two years." Ms. Wright verified that she did not speak to Ms. Veasley on December 17 because Ms. Veasley was inside of a police cruiser.

Rodriques Turner, the victim's first cousin, testified at trial that he went to the victim's house on December 17 after being informed that the victim had been killed. Mr. Turner stated that he had known the Defendants for years at the time of the victim's murder and that he saw the Defendants "together every day[.]" Mr. Turner stated that he informed the case coordinator, Sergeant Burton, over the phone that the Defendants asked him if he "ha[d] any .22 bullets" a few days before the shooting. On cross-examination, he affirmed the he saw Defendant Williams "with a .22[-caliber gun]" while the Defendants were asking for .22-caliber bullets. Though he affirmed that he was charged with driving on a suspended license and that there was a warrant for his arrest prior to trial, he stated that the prosecutor in the instant case requested "to have [that] warrant recalled" because Mr. Turner "[wa]s a witness of [the State] in a murder case[.]" On redirect examination, Mr. Turner affirmed that the State "didn't make [him] any kind of promises about the outcome of [his] case" and that he told Sergeant Burton about the .22-caliber bullets "before he ever got that driving case" and "before [the prosecutor] ever talked to [him.]" He agreed that Sergeant Burton never asked to speak with him in person or for him to give a formal statement.

Johnnie Jackson testified at trial that he was the neighbor in the house that Ms. Veasley ran to for help on December 17. He stated that his "wife called [him] from the back because a young woman was beating on the door." Though the wooden door was already open, he did not open the glass security door to her but could see and hear her through the glass. Ms. Veasley was "highly upset" and said, "[H]elp, we're being robbed." Mr. Jackson's wife called police, and Mr. Jackson watched Ms. Veasley go "back across the street." On cross-examination, Mr. Jackson stated that he did not remember whether he shut the wood door after Ms. Veasley left his house, did not remember hearing any gunshots, and could not remember whether Ms. Veasley had a cell phone in her hand, though he thought his wife saw a phone in her hand.

Officer Brandon Askew testified at trial that he was employed by the Memphis Police Department ("MPD") in 2014, and he and his partner responded to the victim and Ms. Veasley's house at approximately 10:22 p.m. on December 17 after receiving reports of a robbery. He stated that Ms. Veasley was "in the middle of the roadway flagging [them] down" as they approached the residence and was "distraught, screaming." Officer Askew noticed "taillights near [the victim's] house[,]" and Ms. Veasley repeated, "[T]hey're getting away, they're getting away[,]" as Officer Askew's partner approached

her. Ms. Veasley was "pointing towards the area that [they] saw the taillights" when they approached her, and she gave them a description of her white Lexus. Officer Askew's partner stayed with Ms. Veasley while Officer Askew "attempted to locate the vehicle" because he believed the vehicle "had fled the scene." Officer Askew later discovered the white Lexus parked up against the house "directly to the east" of the victim's house, and the white Lexus had apparently "rolled into" the house. Officer Askew testified that "a large vacant lot" separated the two houses, and he believed based on tire tracks that the white Lexis "left northbound around the [victim's] house, turned east[,] and traveled through the empty lot until it came to a rest[.]"

After locating the white Lexus, Officer Askew and his partner entered the residence to ensure that no one was hiding inside after Ms. Veasley reported that there were two suspects. Officer Askew entered the residence through the wide-open front door and "observed a black male [l]ying face down in the living room[,] unresponsive." As Officer Askew and his partner approached the victim, they "observed some head trauma[,] and [they] believed [the victim] was deceased at the time." Officer Askew's partner was "trying to manage [Ms. Veasley,]" who was "in [a] distraught state" and trying "to get in[side] to the victim[.]" Once more officers arrived at the crime scene, Ms. Veasley was "placed in the back of a patrol car in an attempt to calm her down and make sure she didn't cause any further harm to the crime scene or herself." On cross-examination, Officer Askew affirmed that he spoke with Ms. Veasley in the police car, and she informed him that she did not know the identity of the two intruders and that they had driven off in her white Lexus. She also told Officer Askew that one of the suspects was "a black male" with a "long gun" who told her that "Little Murk sent [them.]" The suspects repeatedly asked her where the money was.

On redirect examination, Officer Askew affirmed that he had previously experienced "witnesses who know who their attackers are[,] but they don't volunteer that information to the police[.]" He further affirmed that the victim's residence was in a high-crime area and that it was possible Ms. Veasley knew the identity of the suspects and did not tell Officer Askew. Officer Askew stated that he noted the "probable point of entry" was a bedroom window that had been forced open. He also affirmed that there were probably two guns present in the house during the offense. Officer Askew noted that in addition to the .38-caliber revolver that was found on the floor, "there was [.22-caliber] ammunition on the floor" that could not have been fired from the revolver, which Officer Askew stated "appeared to be a larger caliber than a .22."

MPD Sergeant Anthony Barbarotto testified that he worked in the crime scene investigation unit and was assigned to process evidence from the victim's house on December 18, 2014. He stated that he processed the white Lexus and the victim's car, a black Lexus. While processing the white Lexus, Sergeant Barbarotto found "two [black]

head rags" in the front-passenger seat and collected "seven [finger]print cards" from the vehicle. On cross-examination, Sergeant Barbarotto affirmed that he did not know whether the fingerprints were ever analyzed.

MPD Sergeant Gladys Burton testified that she worked as a detective in the homicide bureau and was assigned to the victim's murder as a case coordinator. She was called to the victim's residence at approximately 11:50 p.m. on December 17, 2014. Sergeant Burton detained Defendant Williams at the scene and obtained his personal information after witnessing him cross through the crime scene tape and "c[o]me into the crime scene." She affirmed that she considered Defendant Williams a potential suspect and learned from Mr. Turner a few days later that the Defendants had asked him for .22-caliber ammunition prior to the victim's murder. Sergeant Burton then tasked Sergeant Eric Kelly with locating Defendant Williams.

Sergeant Burton "attempted to get a statement from [Ms. Veasley]" at the police station on the night of the victim's murder but "ended up having an officer take her home" because "[s]he was very distraught, [and Sergeant Burton] couldn't make much sense out of anything that she was saying." Sergeant Burton stated that Ms. Veasley returned to the police station the next day and gave a formal statement, in which she identified Defendant Williams as the victim's shooter. On January 4, 2015, Sergeant Burton took a second formal statement from Ms. Veasley, in which she identified Defendant Johnson as the actual shooter and Defendant Williams as the second intruder. Sergeant Burton stated that the fingerprints obtained from the Lexus belonged to the victim and his car mechanic. Sergeant Burton testified that officers obtained a voluntary DNA sample from Defendant Williams and collected Defendants Johnson's DNA sample after obtaining a warrant for it.

MPD Sergeant Eric Kelly testified that he worked in the homicide bureau and was called to the crime scene on the morning of December 18, 2014. Sergeant Kelly stated that Sergeant Burton tasked him with locating Defendant Williams so that Sergeant Burton could speak with him. Sergeant Burton gave Sergeant Kelly Defendant Williams' personal information and physical description. Sergeant Kelly began his search for Defendant Williams at the high school where he was enrolled, but he was not present at school on December 18. Sergeant Kelly then went to Defendant Williams' residence, which was near the crime scene, and Defendant Williams arrived at the residence while Sergeant Kelly was speaking with his family members. Sergeant Kelly then obtained a DNA sample from Defendant Williams with his consent. He later obtained a DNA sample from Defendant Johnson after securing a warrant for the sample.

MPD Officer Lee Walker testified that he worked as a crime scene investigator and was called to the victim's residence on December 17, 2014. At trial, he identified

photographs he had taken at the crime scene, including photographs of a wooden board inside the house that was forced from a window, a piece of plexiglass outside of the house under the same window, Ms. Veasley's laptop on the floor, a piece of insulation on the bed in the master bedroom, a dresser with opened drawers in the master bedroom, and a safe in the master bedroom. Officer Walker also identified photographs he took at the crime scene of the .38-caliber revolver and the .22-caliber ammunition. Officer Walker found unfired .22-caliber ammunition in the living room, kitchen, and by the front door. He also noted that "there were signs of a struggle" in the kitchen.

Officer Walker affirmed that he did not attempt to obtain fingerprints from the plexiglass because it was raining. He stated that the lighting was so poor at the crime scene that it hindered the investigators' ability to process it, and investigators decided to "hold the crime scene until morning when [investigators] had better lighting." Officer Walker stated that after he left the residence that night, Officer Eric Carlisle finished processing the scene the next morning. On cross-examination, Officer Walker affirmed that he was not instructed to search for fingerprints inside of the residence because of the poor lighting. He also affirmed that he did not find any "muddy footprints or bloody footprints or anything like that" at the scene.

MPD Officer Carlisle testified that he worked as a crime scene investigator and was called to the victim's residence on December 18, 2014, and processed the entire residence. Officer Carlisle testified that he collected swab samples of potential DNA and blood evidence. He identified photographs he had taken of .22-caliber ammunition in the house and what "appeared to be castoff blood spatter[,]" which occurs "if somebody is bleeding[,] and then there's motion[.]" He also identified photographs of a sweatshirt and a glove found in the kitchen. Officer Carlisle photographed a ".22[-caliber] rifle tubular magazine" in the kitchen. Officer Carlisle used an illustration of a .22-caliber long rifle to explain a "rifle tubular magazine" to the jury, stating that on "a lot of [.]22-[caliber] long rifles, . . . you have a long round tube that usually holds about 14 .22[-caliber] rounds." Officer Carlisle also photographed Defendant Williams on December 18, including photographing a "a scratch that was in the process of healing" behind his right ear and a "fresh scratch behind his left ear" that appeared to have "bled[,] and the blood was drying or had dried." On cross-examination, Officer Carlisle affirmed that he did not observe any wounds on Defendant Williams' hands and did not find any fingerprints on the .38-caliber revolver, the .22-caliber ammunition, the laptop, or the piece of insulation. He stated that he did lift fingerprints from a mirror and a shoebox found at the crime scene.

Special Agent Cervinia Braswell of the Tennessee Bureau of Investigation ("TBI") testified at trial without objection as an expert in firearms identification. She processed the .38-caliber revolver and determined that it was in normal operating condition. Agent

Braswell also processed the bullet that was recovered from the victim's abdomen by the medical examiner and determined that it was a ".22 long rifle caliber bullet." Based on the bullet's "rifling characteristics," Agent Braswell was able to use a rifling characteristics database to narrow the list of potential firearms that could have fired the bullet. She affirmed that it was impossible that the .38-caliber revolver fired the bullet that was recovered from the victim's abdomen. Agent Braswell verified that the magazine found at the crime scene by Officer Carlisle was "made for a .22[-caliber] rifle[,]" and the recovered bullet "could have come from [the] gun that [the magazine] came off of[.]"

Samantha Spencer, a former TBI special agent forensic analyst, testified at trial without objection as an expert in forensic biology. While at the TBI, Ms. Spencer processed the DNA samples from the Defendants, swabs from the .38-caliber revolver, the two black head rags, the rifle magazine, a glove from the crime scene, a sweatshirt from the crime scene, and the victim's DNA sample. Ms. Spencer stated that she identified the victim's DNA on swabs taken at the crime scene from the hallway and kitchen. She identified the victim's DNA and the DNA of at least one other person in the samples taken from the kitchen floor and the sweatshirt. The glove collected from the crime scene contained DNA from "at least four individuals, at least one male." Ms. Spencer affirmed that she was not able to identify DNA on the other items she processed and did not find Defendants' DNA on any of the items. On cross-examination, she conceded that she did not test the rifle magazine for DNA and did not process hair found in the black head rags because the TBI does not perform hair analysis.

Dr. Erica Curry testified without objection as an expert in pathology. Dr. Curry performed the victim's autopsy and observed "several lacerations near his eyebrows, . . . on his nose, [and] on his upper and lower lips[.]" She also observed a two-inch laceration on the back of the victim's head that was "consistent with" the victim "getting hit on the top of the head with a butt of a . . . rifle[.]" Dr. Curry noted that the victim died from a gunshot wound to the left side of his chest, which entered "between the fourth and fifth ribs" and then proceeded "through the covering of the heart[,]" then "through the heart on the right side[,]" then "through the right side of the diaphragm[,]" then finally "through the liver" before being recovered from the right side of the victim's abdomen.

The Defendants did not testify on their own behalf. Following the close of all proof, the jury found the Defendants guilty of first degree felony murder, aggravated burglary, and employment of a firearm during the commission of a dangerous felony, and the jury additionally found Defendant Johnson guilty of aggravated robbery and theft of property valued at more than $1000. Defendant Johnson received a sentence of life imprisonment plus nine years, and Defendant Williams received a life sentence.

## ANALYSIS

On appeal, the Defendants argue that the evidence is insufficient to support their convictions, specifically noting that Ms. Veasley gave "unreliable testimony" and did not originally identify them as the perpetrators of the victim's murder. The Defendants also argue that the trial court erred by failing to exclude Ms. Veasley's testimony regarding the Defendants' alleged previous burglaries of her home in violation of Tennessee Rule of Evidence 404(b). Defendant Johnson additionally argues that "the cumulative effect of all of the aforementioned errors results in prejudicial error and denial of a fair trial." Furthermore, Defendant Williams argues that the trial court committed plain error by admitting the photograph of him taken by Officer Carlisle and that the court violated both the United States Constitution and the Tennessee Constitution in sentencing him to life imprisonment because he was a minor at the time of the offense. The State responds that the evidence is sufficient to sustain the Defendants' convictions and that Ms. Veasley's testimony was not subject to Rule 404(b) analysis, and even if the trial court erred in admitting her testimony, any error was harmless. In response to Defendant Johnson, the State asserts that the cumulative error doctrine is inapplicable in the instant case. In response to Defendant Williams, the State argues that he has not established plain error and that this court has repeatedly rejected such an argument against a juvenile's life sentence. We agree with the State.

### I. Sufficiency of the Evidence

The Defendants argue that the evidence is insufficient to sustain the jury's verdicts and specifically challenge the evidence of their identity as the perpetrators of the offense, noting that Ms. Veasley was the sole eyewitness, did not originally identify the Defendants as the perpetrators, and gave "unreliable testimony[.]" Defendant Johnson asserts that "justice demands this court review the credibility of the witnesses." Defendant Williams argues that "the State did not prove the identity of the [D]efandant[s] beyond a reasonable doubt."

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754

S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)).

This court has explained that a perpetrator's identity "is an essential element of any crime" that the State must prove beyond a reasonable doubt. State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App. Apr. 19, 2005). A perpetrator's identity "may be established by direct evidence, circumstantial evidence, or a combination of the two." State v. Juan Diego Vargas, No. M2015-02458-CCA-R3-CD, 2017 WL 678839, at *5 (Tenn. Crim. App. Feb. 21, 2017), perm. app. denied (Tenn. June 7, 2017). The identification of the defendant as the

perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). Further, this court has repeatedly held that "the testimony of a victim, by itself, is sufficient to support a conviction." Id. (citing State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)). This court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Dorantes, 331 S.W.3d at 379.

Defendant Johnson cites to State v. Untwon Bishop, No. 02C01-9508-00243, 1997 WL 1222, at *5 (Tenn. Crim. App. Mar. 19, 1997), to support the assertion that "there are instances where the unreliability of a verdict is so overwhelming that the reviewing court must overrule the jury's findings in order to mete out fairness and justice."[1] Specifically, Defendant Johnson argues that the "unreliable testimony of Ms. Veasley, the only fact witness," conclusively indicates that no reasonable trier of fact could have found the essential elements of the offenses beyond a reasonable doubt. The Defendants both ultimately contend that the State did not prove their identities beyond a reasonable doubt, based on Ms. Veasley's testimony, and that the evidence is therefore insufficient to maintain their convictions.

The Defendants' arguments involve matters of credibility. Ms. Veasley testified that she did not identify the Defendants during her call to 911 or during her conversation with officers at the crime scene. In her first formal statement, Ms. Veasley identified Defendant Williams as the man with the gun and did not identify the second suspect. In

---

[1] In State v. Marlo Davis, No. W2011-01548-CCA-R3-CD, 2013 WL 2297131, at *5 (Tenn. Crim. App. May 21, 2013), aff'd, 446 S.W.3d 49 (Tenn. June 3, 2015), Defendant Johnson's defense counsel submitted the same argument against the sufficiency of that defendant's convicting evidence and likewise cited to Bishop in support of that argument. This court noted that

> [t]he Bishop court relied upon the previous standard of State v. Crawford, which required the State to prove facts and circumstances "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." 225 Tenn. 478, 470 S.W.2d 610, 612 (Tenn. 1971). In State v. Dorantes, 331 S.W.3d 370 (Tenn. 2011), our supreme court overruled Crawford and held that circumstantial evidence should be treated the same as direct evidence when determining the legal sufficiency of the evidence.

Davis, 2013 WL 2297131, at *5 n.7.

This court further concluded that the Davis defendant's "attack on the sufficiency of the evidence [wa]s essentially an argument as to the credibility of the witnesses and assertions that conflicts in the proof must be construed in favor" of the defendant and noted that "this argument must fail in light of the well[-]established law[.]" Id. at *6.

her second formal statement, Ms. Veasley identified Defendant Johnson as the man with the gun and Defendant Williams as the second suspect. Ms. Veasley explained that she was afraid of the Defendants but was more afraid of Defendant Johnson because Defendant Williams "was never known to shoot people, but [she] was afraid of [Defendant Johnson] with th[e] gun in [her] face[.]" Further, as the State notes, "[a]ll of these inconsistencies were presented to the jury over two days in some 100 pages of transcript." Officer Askew also testified that he had previously interviewed suspects in high-crime neighborhoods who knew the identity of their attackers but did not relay that information to police.

Viewed in the light most favorable to the State, the evidence shows that Ms. Veasley and the victim returned home to find the Defendants inside of their residence on December 17, 2014. Defendant Johnson pointed a "long gun" towards Ms. Veasley's face while Defendant Williams stood behind him. When the victim saw the intruders, he attempted to disarm them and told Ms. Veasley to go get help. Ms. Veasley then ran across the street to ask her neighbors for help and then returned to her home while calling 911 on her cell phone. During this time, the victim was shot and killed. As Ms. Veasley neared her home, Defendant Johnson emerged, still pointing his gun at her and demanding money. He then tried to force her into her car so that she could take him to "where the money was," but he drove away after noticing police sirens approaching. Ms. Veasley did not see Defendant Williams again after initially seeing him inside her home. Police first considered Defendant Williams a suspect because he asserted himself into the crime scene, crossing the crime scene tape. Mr. Turner also informed police that the Defendants asked him for .22-caliber ammunition a few days before the victim's murder. Ms. Veasley and Mr. Turner recognized the Defendants because they both lived in the victim's neighborhood.

Despite the Defendants' arguments, the jury heard Ms. Veasley undergo extensive questioning regarding the previous inconsistencies and still chose to accredit her testimony, as is its prerogative. This court does not reweigh the evidence or substitute its own inferences for those drawn by the trier of fact. Dorantes, 331 S.W.3d at 379. Viewed in the light most favorable to the State, the record demonstrates that the Defendants were the intruders who shot and killed the victim. A rational trier of fact could easily find as such. Accordingly, we conclude that the evidence presented by the State was sufficient to sustain the identification of the Defendants as the perpetrators and therefore the verdicts.

**II. Admission of Ms. Veasley's Testimony**

The Defendants next assert that the trial court abused its discretion in failing to exclude Ms. Veasley's testimony that the Defendants had previously broken into her

residence. In a jury-out hearing, Ms. Veasley proposed to testify that she did not name Defendant Johnson as the man with the gun in her first formal police statement because she felt "[her] life was in danger[,]" and she "didn't know what . . . [the Defendants] were capable of doing to [her] if [she] told [police]" Defendant Johnson's name. Defense counsel agreed that they did not take issue with Ms. Veasley's proposed testimony after hearing it. The trial court decided to defer its ruling on the break-in testimony until hearing the actual content of Ms. Veasley's testimony in front of the jury.

During defense's cross-examination of Ms. Veasley, defense counsel asked Ms. Veasley, "[I]sn't it true that in your second statement[,] when the police asked you why you identified [Defendant Williams] as the shooter, you told the police that you wanted [Defendant Williams] to suffer?" The State then argued that the Defendants had "opened the door" for the State to question Ms. Veasley about her complete answer because defense counsel had specifically quoted and asked about the first line of Ms. Veasley's statement. The State further asserted that Ms. Veasley's full answer spoke "to her state of mind and why she lied in the first statement." Though defense counsel argued that testimony regarding the previous break-ins should be excluded under Tennessee Rule of Evidence 404(b) as prior bad acts, the trial court explained,

> I'm not sure this is really governed by 404(b) now. . . . You have introduced part of her answer and don't want the rest of her answer in[,] and I think to complete this, that makes sense.
>
> . . . I kind of think you opened the door to any explanation as to why. And if you opened the door, then we have really taken it out of 404(b). You've made something relevant that might not have been relevant. [D]efense counsel has beaten the witness to death about these prior statements that were false[,] and I just think that in that context . . . under these circumstances[,] she has a right to complete the answer.
>
> Now[,] I think that [defense counsel] has a right on [re]cross-examination to dispel-to ask her about the truth of these matters but we're talking about her state of mind . . . . It's still her state of mind [as to] why she's fearful.
>
> So I will, if [defense counsel] want[s] me to, tell the jury these matters are . . . not being necessarily introduced to show the truth of the matters contained therein.

The State discussed Ms. Veasley's full answer with her on redirect examination, and defense counsel thoroughly questioned Ms. Veasley about the break-ins on recross-examination. On recross-examination, Ms. Veasley ultimately conceded that she did not

- 13 -

possess any personal knowledge as to whether the Defendants had actually broken into her house previously and that her definitive statement that they had actually broken into her house was a "mistruth."

On appeal, the Defendants argue that the trial court erred in admitting Ms. Veasley's testimony regarding the previous break-ins in violation of Tennessee Rule of Evidence 404(b), specifically asserting that the trial court did not conduct the four-part analysis required by Rule 404(b).

Tennessee Rule of Evidence 404(b) provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait."  Such evidence may, however, be admitted for other purposes if the following conditions are met prior to admission of this type of proof:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).  "Other purposes" have been defined to include the defendant's motive, intent, guilty knowledge, identity, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation.  See State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004).  If the trial court substantially complies with the procedural requirements, its decision will only be reversed if it "applie[d] an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in an injustice to the complaining party."  Wilson v. State, 367 S.W.3d 229, 235 (Tenn. 2012).

Despite the Defendants' arguments to the contrary, we agree with the State that Rule 404(b) does not govern Ms. Veasley's testimony regarding the prior break-ins.  We initially note that the trial court did not admit Ms. Veasley's full answer pursuant to Rule 404(b) but inferentially pursuant to Rules 613 and 106.  In our view, this matter is governed by Tennessee Rule of Evidence 613, which sets out the procedure for utilizing

- 14 -

the prior statement of a witness for impeachment purposes.  In an attempt to impeach Ms. Veasley's testimony regarding her reasoning for lying to police, defense counsel introduced Ms. Veasley's second police statement as a prior inconsistent statement.  In that police statement, Ms. Veasley explained that she lied about Defendant Williams being the man with the gun because she "wanted him to suffer" because he had broken into her house several times.  On direct examination, Ms. Veasley stated that she lied to police in her first police statement because she was "scared" and had "never been through nothing like this before."  On cross-examination, defense counsel asked her, "[I]sn't it true that in your second statement[,] when the police asked you why you identified [Defendant Williams] as the shooter, you told the police that you wanted [Defendant Williams] to suffer?"  She said, "yes," and was not asked anything else regarding her answer in the police statement.  Prior to redirect examination, the State requested a jury-out hearing regarding the introduction of Ms. Veasley's full answer, arguing that her reasoning for giving the inconsistent statements was "relevant as to her state of mind, now particularly that [defense counsel] opened the door[,] and I think [the State] should be able to ask the rest of that information."  As we previously laid out, the trial court agreed with the State, reasoning that Rule 404(b) was not applicable in this context because defense counsel "introduced part of [Ms. Veasley's] answer and d[idn't] want the rest of the answer in," had "opened the door to any explanation as to why" Ms. Veasley gave inconsistent statements to police, and had "beaten the witness to death about these prior [false] statements" in front of the jury, and Ms. Veasley had a "right to complete [her] answer" under "these circumstances[.]"  Accordingly, the State was allowed on redirect examination to discuss the entirety of Ms. Veasley's answer with her, and defense counsel was allowed to thoroughly recross-examine Ms. Veasley regarding her truthfulness in explaining the previous break-ins.

Impeachment evidence, like any evidence, must be relevant in order to be admitted into evidence.  State v. Leach, 148 S.W.3d 42, 56 (Tenn. 2004).  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. The determination of relevancy is left to the discretion of the trial court, and this court will not overturn a trial court's determination in this regard in the absence of an abuse of discretion.  State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

The rules of evidence limit the introduction into evidence of prior inconsistent statements of witnesses.  Tennessee Rule of Evidence 613(b) relevantly provides:

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny

the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice require otherwise.

See also State v. Reece, 637 S.W.2d 858, 861 (Tenn. 1982). Tennessee Rule of Evidence 613(b) allows the introduction of otherwise inadmissible extrinsic evidence for impeachment. State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998); see also State v. Smith, 24 S.W.3d 274, 280-81 (Tenn. 2000). A prior inconsistent statement introduced solely for purposes of impeachment may be considered only on the issue of credibility and not as substantive evidence. Reece, 637 S.W.2d at 861. When presented with a prior inconsistent statement, a "witness has several possible responses: the witness can admit, deny, or not remember making all or part of the statements." Neil P. Cohen et al., Tennessee Law of Evidence § 613[5][a] (6th ed. 2011). If the witness admits making the prior inconsistent statement, any extrinsic proof of the statement would be cumulative and therefore inadmissible. Id.

Additionally, Tennessee Rule of Evidence 106 provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Tenn. R. Evid. 106. "Rule 106, often referred to as the *rule of completeness*, reflects a concern for fairness and is designed to let the jury assess related information at the same time rather than piecemeal." Neil P. Cohen et al., Tennessee Law of Evidence § 1.06[2][a] (6th ed. 2011). "Rule 106 applies a rule of completeness when *fairness* so requires." Id. § 1.06[2][b]. The trial court is granted broad discretion to determine whether the rule of completeness should result in the admission of evidence, and this court therefore reviews the trial court's decisions in this matter under an abuse of discretion. Id.; see also State v. Torres, 82 S.W.3d 236, 252 (Tenn. 2002); State v. Keough, 18 S.W.3d 175, 183 (Tenn. 2000). Further, "Where specific questions and answers taken out of context do not convey the true picture of the prior statement alleged to be inconsistent, it is unfair to permit reference to isolated, unexplained responses by the witness and there is no error in allowing the statements to be placed in context." State v. Boyd, 797 S.W.2d 589, 594 (Tenn. 1990). "While Rule 106 refers on its face to the introduction of a portion of a writing, this Court has previously held that 'cross-examination in extensive detail about a witness's prior statement is tantamount to an introduction of the statement for Rule 106 purposes.'" State v. Dylan Brewer, No. W2017-01725-CCA-R3-CD, 2019 WL 1109917, at *14 (Tenn. Crim. App. Mar. 11, 2019) (citing State v. Vaughan, 144 S.W.3d 391, 408 n.2 (Tenn. Crim. App. 2003) (internal citations omitted)).

Analyzing this issue in the context of Rule 613, we note that in the present case, Ms. Veasley admitted on cross-examination that she made inconsistent statements to police. Thus, extrinsic evidence of the prior inconsistent statement would ordinarily be

inadmissible. Martin, 964 S.W.2d at 567. The State could have objected to the effective introduction of the statement. We also note that although the police statement was admitted as an exhibit for identification purposes only, this court has stated that "'cross-examination in extensive detail about a witness's prior statement is tantamount to an introduction of the statement for Rule 106 purposes.'" Dylan Brewer, 2019 WL 1109917, at *14. On redirect, Ms. Veasley was "afforded the opportunity to explain" why she made the statement. Tenn. Rule Evid. 613. Defendant Williams' defense counsel, by strategically introducing only one line from Ms. Veasley's complete answer and hoping the jury would not hear the rest of the answer, opened the door, making it permissible under Rule 613 for Ms. Veasley to explain why she lied in her first police statement and to complete her answer given in the second police statement.[2] Thus, Ms. Veasley's redirect testimony regarding her complete answer in the second police statement did not fall under Rule 404(b).

The trial court properly determined that the statement was used to show Ms. Veasley's state of mind at the time she gave the first police statement in which she claimed Defendant Williams was the man with the gun. This court has previously noted that "[s]tatements that the victim fears the defendant are admissible if the victim's state of mind is relevant[,]" like if used to "explain why the victim might [have] give[n] untrue accounts[.]" State v. Timothy Andrew Bishop, No. M2015-00314-CCA-R3-CD, 2016 WL 7324307, at *11 (Tenn. Crim. App. Dec. 16, 2016). The trial judge offered to instruct the jury to this effect, though counsel declined such an instruction in order not to draw attention to the break-in testimony. The complete statement was not offered to prove that the Defendants were involved in the previous break-ins of Ms. Veasley's home. Instead, the complete statement was used to discount defense counsels' assertion that Ms. Veasley lied to police only because she wanted Defendant Williams, and inferentially Defendant Johnson, to suffer and to explain her fear and the reasoning behind it. As both the State and the trial court noted, the State was simply allowed to place the excerpts of Ms. Veasley's statement, which had been introduced for the first time on cross-examination by defense counsel, into the proper context. Finally, we note that defense counsel was able to solicit testimony from Ms. Veasley on recross-examination that she did not actually have personal knowledge of the Defendants'

---

[2] We note that although it was Defendant Williams' counsel who specifically asked the question regarding Ms. Veasley wanting Defendant Williams "to suffer," Defendant Johnson's counsel also cross-examined Ms. Veasley regarding her inconsistent statements to police and asked Ms. Veasley, "Of course that's the statement you gave the police after you had been at home with all those people in your mama's house[,] right?" Defendant Johnson's counsel later asserted to the trial court that Defendant Johnson had not opened the door and that the information regarding the break-ins "would be highly prejudicial under 404(b). I think we are still under that." The trial court disagreed and stated that Defendant Johnson's "strict cross-examination on the same point probably opened the door also." We agree with the trial court's reasoning.

- 17 -

breaking into her house, and although the trial court offered to instruct the jury that the testimony regarding the break-ins should not be considered substantive evidence, defense counsel refused such an instruction so that the jury's attention would not be called to the break-ins.

The complete answer was properly admitted for rehabilitative purposes following Ms. Veasley's impeachment and to allow the isolated portion of her answer to be placed into the overall context of her entire answer.

Regardless, even if the admission of Ms. Veasley's full answer was error under Rule 404(b), it would ultimately have been harmless error. As we have laid out, the jury heard defense counsels' thorough recross-examination of Ms. Veasley regarding the previous break-ins and heard Ms. Veasley concede that she did not have actual personal knowledge of the Defendants breaking into her house and that telling police she did was a "mistruth." An error in admitting evidence under Rule 404(b) is subject to harmless error analysis, and thus, relief is available only where the "error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); see State v. Jones, 450 S.W.3d 866, 900 (Tenn. 2014) (applying this standard where the trial court erred in admitting evidence under Rule 404(b)).

### III. Cumulative Error (Defendant Johnson)

Defendant Johnson lastly argues that the cumulative effect of the errors at trial warrants reversal, even if none of the errors do so individually. However, having found no errors, we respectfully disagree and conclude that Defendant Johnson is not entitled to relief on the basis of cumulative error. See State v. Hester, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings.").

### IV. Plain Error (Defendant Williams)

Defendant Williams argues that the trial court committed plain error in admitting the photographs Officer Carlisle took of him after Defendant Williams crossed through the crime scene tape and entered the crime scene. Specifically, he argues that the photographs were improperly admitted as "fruits from the poisonous tree in violation of the Fourth Amendment of the United States" after the "suppression hearing that deemed [Defendant Williams'] arrest illegal." The State responds that the record does not establish that Defendant Williams "was unlawfully detained or that the photograph was taken without his consent."

- 18 -

The doctrine of plain error applies when all five of the following elements have been established:

> (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the issue was not waived for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

State v. Minor, 546 S.W.3d 59, 67 (Tenn. 2018). A defendant's failure to establish any of these criteria requires denial of relief under the plain error doctrine, and "an appellate court need not consider all criteria when the record demonstrates that one of them cannot be established." Id. "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." State v. Page, 184 S.W.3d 223, 231 (Tenn. 2006). Additionally, "[f]or a substantial right of the accused to have been affected, the error must have prejudiced the [defendant]. In other words, it must have affected the outcome of the trial court proceedings." State v. Armstrong, 256 S.W.3d 243, 250 (Tenn. Crim. App. 2008) (citations omitted). The party claiming plain error has the burden of persuading the appellate court. State v. Banks, 271 S.W.3d 90, 119 (Tenn. 2008).

Both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures. See U.S. Const. Amend. IV; Tenn. Const. art. I, § 7. "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998) (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)). "[T]he general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered is subject to suppression." State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012). Under the "fruit of the poisonous tree" doctrine, evidence obtained by exploitation of an unconstitutional search and seizure may also be suppressed. See State v. Ingram, 331 S.W.3d 746, 760 (Tenn. 2011) (citing Wong Sun v. United States, 372 U.S. 471, 488 (1963)).

Following a hearing on Defendant Williams' motion to suppress his formal police statement following his arrest, the trial court granted the motion on the grounds that Defendant Williams had been illegally arrested without probable cause. We note that neither the written order granting Defendant Williams' motion to suppress nor the transcript from the suppression hearing is included in the record on appeal. At trial, Defendant Williams objected to the admission of the photograph Officer Carlisle took of him at the crime scene solely on the grounds that Officer Carlisle did not possess "the

specialized medical knowledge" to comment on the scratch behind Defendant Williams' ear that was depicted in the photographs. Defendant Williams apparently argued for the first time in his motion for new trial that the photographs were taken "after his illegal arrest" and were admitted "in violation of the exclusionary rule." In its written order denying the motion for new trial, the trial court explained that "[w]hether the photograph[s] . . . w[ere] fruit of the illegal arrest was not litigated in the motion [to suppress] hearing." The trial court further noted that Defendant Williams never "object[ed] to the admission of the photographs on the basis that is now alleged in this motion for new trial." The trial court treated the issue as waived because it was "not raised in the written motion to suppress, litigated at the time of the motion to suppress hearings, nor objected to on this basis at the time of trial[.]"

Defendant Williams argues that the photographs were "fruit of the poisonous tree" because they were taken "during the illegal arrest of [Defendant] Williams." As previously noted, neither the transcript from the suppression hearing nor the written order granting the motion to suppress is included in the record on appeal. It is therefore unclear whether the trial court determined that Defendant Williams was under "illegal arrest" at the time the photographs were taken. The only reference to the issue by the trial court was that "[w]hether the photograph[s] . . . w[ere] fruit of the illegal arrest was not litigated in the motion [to suppress] hearing." During trial, Defendant Williams' defense counsel cross-examined Sergeant Burton regarding her asking Officer Carlisle to photograph Defendant Williams. Defense counsel asked her, "He did come inside the crime scene tape[,] right?" When she answered affirmatively, defense counsel asked, "And you just got some basic information from him, right?" During direct examination, the State asked Sergeant Burton if police "had enough to . . . detain [Defendant Williams] without his permission" when he walked through the crime scene tape. Sergeant Burton replied, "No, it was more for just identification." Defense counsel also cross-examined Officer Carlisle about the interaction and solicited testimony from him that "there were no wounds on [Defendant Williams'] hands" and that Sergeant Burton "did not point out any other wound" on Defendant Williams.

Applying the aforementioned plain error prerequisites, we note that in our view, the record does not clearly establish what occurred in the trial court. Neither the order granting Defendant Williams' motion to suppress nor the transcript of the suppression hearing is included in the record. It is therefore unclear whether the trial court addressed Defendant Williams' interaction with Officer Carlisle at the crime scene or believed the interaction to be unlawful. As we have previously stated, defense counsel only objected to the introduction of the photographs on the grounds that Officer Carlisle did not possess expert medical knowledge. Defense counsel also characterized the interaction as police "just g[etting] some basic information" from Defendant Williams during his cross-examination of Sergeant Burton. The record contains no details regarding this

- 20 -

interaction, and Defendant Williams' appellate brief conclusively states without explanation that he was "effectively 'under arrest' when he was stopped by police" after crossing the crime scene tape. Though it is uncontested that officers interacted with Defendant Williams when he crossed the crime scene tape, he has failed to show that he was subjected at that time to an illegal arrest or that he did not consent to the photographs being taken. Thus, there is nothing in the record to establish that "a clear and unequivocal rule of law" was breached.

Moreover, we are not persuaded that a substantial right of the accused was adversely affected or that consideration of the issue is necessary to do substantial justice. It is our view that Defendant Williams suffered no actual prejudice from the admission of the photographs. It is difficult to conclude that such an admission affected the outcome of the trial. The jury heard testimony from Officer Carlisle that the only markings on Defendant Williams were small scratches behind his ears that were in the process of healing and that he did not have any wounds on his hands. Further, the photographs only show the Defendant standing in the street wearing ordinary clothing. He is not handcuffed or depicted in a way that might suggest guilt. Multiple officers gave testimony regarding Defendant Williams' interaction with officers at the crime scene, and such testimony was not objected to at trial, in the motion for new trial, or on appeal. As noted, Defendant Williams' defense counsel solicited some of that testimony. It is apparently only the photographs themselves that are at issue on appeal.

The photographs of Defendant Williams were introduced during Officer Carlisle's direct testimony. State's exhibits 52 through 89 were introduced through Officer Carlisle, and the State asked Officer Carlisle questions about each exhibit and the circumstances surrounding its respective collection. In explaining the pictures of Defendant Williams, which were marked as exhibits 80 through 83, Officer Carlisle stated that Defendant Williams "lived next door" to the crime scene and later in his testimony referred to Defendant Williams as "the next door neighbor[.]" Defendant Williams' defense counsel also reiterated that Defendant Williams was at the crime scene because he lived next door during his cross-examination of Sergeant Burton and Officer Carlisle. From a careful reading of the trial transcripts, it appears that Defendant Williams' defense counsel minimized Defendant Williams' interaction with police at the crime scene and explained his presence there as him being the next door neighbor. In fact, the photographs might have even been helpful to Defendant Williams' assertion that he was not the person who committed the murder, as the jury heard testimony that the victim had struggled with the intruders. The Defendant has failed to meet his burden of persuading this court and accordingly is not entitled to plain error relief on the issue of admission of the photographs.

## V. Sentencing (Defendant Williams)

Finally, Defendant Williams argues that his sentence of life imprisonment violates the Eighth Amendment prohibition against cruel and unusual punishment and the Tennessee constitution's corresponding counterpart. See U.S. Const. amend. VIII; Tenn. Const. art. I, § 16. Specifically, he asserts as an African American male, he has a life expectancy of "66.1 years" and will not be afforded "an opportunity for release until *after* his lifespan is expected to run out." Accordingly, he reasons that his life sentence is synonymous with a "sentence of life-without-parole, at best." The State responds that this court has repeatedly rejected such an argument. We agree with the State.

Defendant Williams argues that his sentence "can also be seen as a death sentence" by citing statistics that show he will not be eligible for release "until he is theoretically on the verge of death." He reiterates that he was a minor at the time of the offense and was convicted as charged of first degree felony murder and sentenced to life imprisonment, the minimum, statutorily mandated sentence for first degree felony murder. See Tenn. Code Ann. § 39-13-202(c). As is relevantly stated in Tennessee Code Annotated sections 40-35-501(h)(1) and 40-35-501(i)(1), an individual who committed an enumerated offense after July 1, 1995, must serve sixty years of a life sentence before becoming eligible for release. If such an individual receives all of the statutorily authorized reduction credits, that individual is entitled to a 15% sentence reduction, equating service of fifty-one years in prison. Id. § 40-35-501(i)(1); Vaughn v. State, 202 S.W.3d 106, 118-19 (Tenn. 2006). Defendant Williams illustrates his argument by explaining that a seventeen-year-old who receives a life sentence would be sixty-eight years old when he first becomes eligible for release.

Defendant Williams also argues that Tennessee's sentencing scheme for first degree murder, which automatically imposes life imprisonment, violates "the foundational principles of" Miller v. Alabama, 567 U.S. 460 (2012), by not allowing the court "discretion to consider the individual characteristics of the defendant or the offense." He notes that in Roper v. Simmons, 543 U.S. 551 (2005), the Supreme Court of the United States found capital punishment of juvenile offenders to be violative of the Eighth Amendment because of a juvenile's "inherently diminished culpability." Defendant Williams also cites Graham v. Florida, 560 U.S. 48 (2010), for the assertion that every juvenile offender must be afforded "a meaningful opportunity for release" when they receive a sentence of life without parole. He also argues that his sentence constitutes a cruel and unusual sentence because he was a minor at the time of the offense, and although "his actions were undoubtedly impulsive, reckless, and immature[,]" his actions "cannot reasonably show any level of irretrievable depravity." See Miller, 567 U.S. at 471 (citing Roper, 543 U.S. at 570 (2005)).

Defendant Williams essentially maintains that because the mandatory sentencing scheme in Tennessee precludes individualized sentencing for juveniles convicted of first degree murder, it violates Miller. See id. at 483. This court has consistently rejected the argument that a juvenile who received a mandatory life sentence requiring the service of fifty-one years before release has essentially received a sentence equivalent to life without parole in violation of Miller. State v. Walter Collins, No. W2016-01819-CCA-R3-CD, 2018 WL 1876333, at *20 (Tenn. Crim. App. Apr. 18, 2018), perm. app. denied (Tenn. Aug. 8, 2018) (citing Martez D. Matthews v. State, No. M2015-02422-CCA-R3-PC, 2016 WL 7395674, at *4 (Tenn. Crim. App. Dec. 21, 2016), perm. app. denied (Tenn. Apr. 13, 2017); Charles Everett Lowe-Kelley, No. M2015-00138-CCA-R3-CD, 2016 WL 742180, at *8 (Tenn. Crim. App. Feb. 24, 2016), perm. app. denied (Tenn. July 21, 2015); Billy L. Grooms v. State, No. E2014-01228-CCA-R3-HC, 2015 WL 1396474, at *4 (Tenn. Crim. App. Mar. 25, 2015), perm. app. denied (Tenn. July 21, 2015), cert. denied, 136 S. Ct. 1216 (Feb. 29, 2016); State v. Kayln Marie Polochak, No. M2013-02712-CCA-R3-CD, 2015 WL 226566, at *34 (Tenn. Crim. App. Jan. 16, 2015), perm. app. denied (Tenn. May 14, 2015); Cyntoia Denise Brown v. State, No. M2013-00825-CCA-R3-PC, 2014 WL 5780718, at *21 (Tenn. Crim. App. Nov. 6, 2014), perm. app. denied (Tenn. May 15, 2015); Floyd Lee Perry, Jr. v. State, No. W2013-00901-CCA-R3-PC, 2014 WL 1377579, at *5 (Tenn. Crim. App. Apr. 7, 2014), perm. app. denied (Tenn. Sept. 18, 2014); Charles Damien Darden v. State, No. M2013-01328-CCA-R3-PC, 2014 WL 992097, at *11 (Tenn. Crim. App. Mar. 13, 2014), perm. app. denied (Tenn. Sept. 18, 2014)). We note that Defendant Williams' sentencing hearing is not included in the record on appeal. Although Defendant Williams was undoubtedly a juvenile at the time of the victim's murder, he was given a sentence of life *with the possibility of parole*, which provides a release eligibility. The holdings of Roper, Graham, and Miller, therefore, do not apply in the instant case. Defendant Williams is not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE